Red Valve, Inc. v. Titan Valve, Inc., 2018 NCBC 31A (Corrected 04-17-2018)

STATE OF NORTH CAROLINA

COUNTY OF GASTON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18CVS1064

RED VALVE, INC. AND
HILLENBRAND, INC.,

Plaintiffs,

vs.

TITAN VALVE, INC.; BEN PAYNE;
FABIAN AEDO ORTIZ; GREG
FARRIS; JOHN DOES 1-10,

Defendants.

**ORDER AND OPINION ON
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
[CORRECTED]**

1.    **THIS MATTER** is before the Court upon Plaintiffs Red Valve, Inc. ("Red Valve") and Hillenbrand, Inc.'s ("Hillenbrand") (collectively, "Plaintiffs" or "Red Valve" or the "Company") Motion for Preliminary Injunction ("Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure in the above-captioned case. Having considered the Motion, the briefs, exhibits, affidavits in support of and in opposition to the Motion, the arguments of counsel at a hearing held on the Motion on April 5, 2018, and the other appropriate documents of record, the Court hereby **GRANTS in part** and **DENIES in part** the Motion as set forth herein.

> *Nelson Mullins Riley & Scarborough LLP, by David N. Allen and Benjamin S. Chesson, for Plaintiffs Red Valve, Inc. and Hillenbrand, Inc.*

> *Gray, Layton, Kersh, Solomon, Furr & Smith, P.A., by Michael L. Carpenter, Marshall P. Walker, and Christopher L. Welchel, for Defendants Titan Valve, Inc, Ben Payne, Fabian Aedo Ortiz, and Greg Farris.*

Bledsoe, Judge.

## I.

## PROCEDURAL HISTORY

2. Red Valve filed a Verified Complaint initiating this action on March 14, 2018, asserting claims against Titan Valve, Inc. ("Titan"), Ben Payne ("Payne"), Fabian Aedo Ortiz ("Aedo"), and Greg Farris ("Farris") (collectively, "Defendants") arising out of Defendants' alleged wrongful conduct in acquiring, possessing, and using Red Valve's alleged confidential and proprietary information in a competing valve manufacturing company they created shortly before Payne and Aedo were terminated from Red Valve on March 14, 2018.

3. At the same time Plaintiffs filed their Verified Complaint, Plaintiffs also filed a Motion for a Temporary Restraining Order (the "TRO Motion") and Preliminary Injunction (the "P.I. Motion"), seeking injunctive relief against Defendants. The TRO and P.I. Motions seek relief based solely on Plaintiffs' claims for alleged misappropriation of trade secrets against all Defendants under N.C. Gen. Stat. § 66-152, *et seq.*, and for breach of contract against Aedo.[1]

4. Later that same day, the matter was designated a mandatory complex business case by the Chief Justice of the Supreme Court of North Carolina and assigned by Chief Business Court Judge James L. Gale to the undersigned.

5. After designation, and also on March 14, 2018, the Court held a hearing on the TRO Motion, *ex parte,* at which Plaintiffs' counsel was present. At the conclusion

---

[1] Plaintiffs also assert claims against all Defendants for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, conversion, and civil conspiracy, and against Defendants Payne and Aedo for breach of fiduciary duty.

of the hearing, the Court entered a temporary restraining order (the "TRO"), which became effective immediately and was scheduled to expire at 2:00 PM on March 24, 2018. In the TRO, the Court noticed a hearing on the P.I. Motion for 9:00 AM on March 23, 2018.

6. On March 22, 2018, the Court granted the parties' joint motion to extend the TRO and rescheduled the hearing on the P.I. Motion for 2:00 PM on April 5, 2018.

7. On March 28, 2018, Plaintiffs filed a motion for expedited discovery (the "Expedited Discovery Motion") in preparation for the hearing on the P.I. Motion. The Court held a telephone hearing on the Expedited Discovery Motion on the following day, March 29, 2018. The Court memorialized its oral ruling at the telephone hearing, granting in part and denying in part the Expedited Discovery Motion in an Order dated March 30, 2018 ("March 30 Order"). The Court's March 30 Order required Defendants to produce limited document discovery to Plaintiffs by 3:00 PM on April 3, 2018 and permitted Plaintiffs to take a Rule 30(b)(6) deposition of Titan on a narrow range of topics at 9:00 AM on April 4, 2018.

8. On April 4, 2018, Plaintiffs advised the Court and Defendants that it intended to offer live testimony from a forensic analyst, Clark Walton, at the P.I. Hearing. By Order dated that same date, the Court ruled that Plaintiffs would not be permitted to offer live testimony at the P.I. Hearing due to their failure to comply with Business Court Rule 7.12. The Court, however, for good cause shown in the circumstances, permitted Plaintiffs to offer limited affidavit testimony from Walton

attesting to certain facts Plaintiffs attributed to Walton in their filings in support of the P.I. Motion.

9. After the completion of full briefing and the permitted expedited discovery, the Court held a hearing on the P.I. Motion on April 5, 2018 as scheduled. All parties were represented by counsel at the hearing. With the parties' consent and for good cause shown, the Court entered an Order on April 5, 2018 extending the TRO until 5:00 PM on April 10, 2018.

10. The Motion is now ripe for resolution.

II.

FINDINGS OF FACT

11. The Court makes the following findings of fact for the limited purpose of resolving the P.I. Motion. These findings are not binding on the Court in later proceedings in this action. *E.g., Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005) ("It is well settled that findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits.").

12. Hillenbrand is a publicly traded company organized under the laws of the State of Indiana with its principal place of business in Batesville, Indiana. Hillenbrand is a diversified industrial company with multiple market-leading brands that serve a wide variety of industries around the world.

13. Red Valve is a wholly-owned subsidiary of Hillenbrand and a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal

place of business in Carnegie, Pennsylvania. Red Valve owns and operates a large manufacturing plant in Gaston County, North Carolina, where it manufactures a variety of valve products, including, in particular, pinch valve sleeves.

14. Payne is a citizen and resident of Gaston County, North Carolina. Payne worked for Red Valve for approximately twenty years. Until March 14, 2018, Payne was Red Valve's Vice President of Operations with responsibility for managing and overseeing all of Red Valve's global manufacturing operations, including oversight of design, procurement, manufacturing, sales support, and business development.

15. Aedo is a citizen of Chile who resides in Pennsylvania and regularly conducts business in North Carolina. Red Valve hired Aedo in December 2009, and from October 2016 until March 14, 2018, Aedo was Red Valve's International Sales Manager for global operations.

16. Farris is a citizen and resident of Gaston County, North Carolina. Farris is the President of Farris Conveyors, which for many years, including through March 2018, served as a manufacturer of component parts for Red Valve.

17. Titan is a corporation organized under the laws of the State of North Carolina with its principal place of business in Gaston County, North Carolina. Farris executed Titan's articles of incorporation on January 25, 2018, and Titan was formed on February 6, 2018 with Farris as Titan's registered agent.

18. Since 1953, Red Valve has designed, manufactured, marketed, and sold tailored engineered elastomer products, including valves, to meet a variety of flow control applications for its global customer base. The products include sleeves,

expansion joints, pinch valves, check valves, and valves utilizing Tideflex technology. Red Valve sells not only "stock" valves, but it also works with customers across the globe to design, market, manufacture, and sell products specifically tailored to meet a variety of flow control applications.

19. In his role as Red Valve's Vice President of Operations, Payne reported directly to Red Valve's President, Glenn Ritzi, and had access to Red Valve's confidential and proprietary information, including Red Valve's business strategies, employee information, financial data, design documents, and manufacturing processes. He was also required to communicate directly with Red Valve's existing and prospective vendors and customers, independent representatives, distributors, and the Company's sales personnel in Carnegie, Pennsylvania. Red Valve terminated Payne's employment on March 14, 2018.

20. In his role as International Sales Manager, Defendant Aedo was responsible for processing orders for existing and new customers, securing new sales representatives and new customers, developing new accounts, building strong relationships with key accounts, and increasing the international sales of the Red Valve product lines. Like Payne, Aedo had access to Red Valve's confidential, proprietary, and trade secret information.

21. As part of his employment with Red Valve, Aedo signed an "Inventions, Improvements, Copyrights and Trade Secrets Agreement" with Hillenbrand ("Trade Secret Agreement"), dated September 18, 2017, which provides at paragraph 2 as follows:

I will carefully guard the trade secrets or confidential information of Company [defined as Hillenbrand or one its direct or remote subsidiaries], and I will not, while in the employ of Company or at any other time thereafter, disclose to anyone, directly or indirectly, nor use the benefit of for myself or third parties, any of Company's trade secrets or confidential information without the written consent of the Company.

(Pls.' Exs. Supp. Mot. Prelim. Inj. Ex. S [hereinafter "Trade Secrets Agmnt."] ¶ 2, ECF No. 28.)

22. Aedo further agreed in the Trade Secrets Agreement that:

Upon leaving the employ of Company, I will not take with me, without written consent of the Company, any property of Company in any form or media whatsoever, including electronic information or data in or on any media or at any location, including in the term "property" but not limited to any engineering or manufacturing drawing, blueprint or other reproduction, technical or manufacturing data, tables and calculations, letters, ledgers, customer lists, bills of material, or copies thereof, or any papers, records, discs, or other media containing confidential information pertaining to the business, operations or financial affairs of Company and I will return to Company any of the same then in my possession. I will hold all such property in my possession in trust and will make no use of such property for the benefit of others in violation of the trust.

(Trade Secrets Agmnt. § 3.)

23. Both Payne and Aedo agreed to "follow the policies" contained in the Red Valve Employee Handbook, including the Handbook's non-disclosure provision—which forbids the improper use or disclosure of Red Valve's confidential or trade secret information because "[t]he protection of confidential business information and trade secrets is vital to the interests and the success of Red Valve." (*See* Pls.' Exs. Supp. Mot. Prelim. Inj. Ex. A [hereinafter "Ritzi Aff."] ¶ 35.) Both Payne and Aedo completed mandatory ethics training concerning, among other things, the unauthorized use and disclosure of trade secrets.

24. In late 2017, Payne, Aedo, and Farris began discussing the formation of a competing valve manufacturing company, which became Titan. Aedo worked to develop sales and marketing plans for the new venture, Farris looked for a building to house the Titan manufacturing facility and tools for making products, and Payne focused on the manufacturing and operations of the new enterprise.

25. Payne, Aedo, and Farris met in Gastonia on January 7, 2018 to discuss Titan. They decided that Titan would manufacture, market, and sell open frame, standard frame, and close frame pinch valves. They also toured property located at 1413 Bessemer City Kings Mountain Highway in Bessemer City, North Carolina on January 11, 2018. That same month, Titan paid to create Titan business cards, a website, Titan-Valve.com email accounts, letterhead, and email signatures.

26. Also in January 2018, Defendants Payne and Aedo began storing and/or using Red Valve's confidential and proprietary information for use in Titan's business.

27. On January 19, 2018 and January 28, 2018, Payne utilized a program called PC Mover Professional, which was created by Laplink Software, on his Red Valve computer. This program moves or restores selected files, settings, user profiles, and programs from an old computer to a new one. Red Valve did not authorize the use of this program and was not otherwise aware that Payne was using it on his Red Valve computer. Starting in October 2017, Payne also began attaching flash drives to his Red Valve computer with increasing frequency compared to his historical use of such devices. Payne stored a large quantity of Red Valve documents, including Red Valve

build sheets, to these flash drives and his personal computer. To date, as many as eleven devices to which Red Valve documents were transferred have not been produced or accounted for.

28. On January 21, 2018, Aedo emailed Payne from his Titan email account to direct him to set up a Dropbox account with his Titan-Valve.com email so they could collaborate on the Titan "work environment." (Pls.' Exs. Supp. Mot. Prelim. Inj. Ex. G.) Aedo had been using a Dropbox account connected to his Red Valve email address to store thousands of files, many of them containing Red Valve's confidential and proprietary information, some of which Aedo altered. Much of the confidential and propriety information stored in the Red Valve Dropbox account was contained in a subfolder labeled "Titan."

29. Based on the evidence of record, at the time of Aedo's termination on March 14, 2018, Aedo's Dropbox account contained at least the following:

   a. in the Titan subfolder, information pertaining to Red Valve's current and prospective customers;

   b. Red Valve price factor sheets and Price Books used to price Red Valve products;

   c. in the Titan subfolder, numerous Red Valve design drawings, as well as (i) a CAD drawing not prepared by Red Valve that exactly duplicates the dimensions, labels, and notes of a Red Valve design drawing, and (ii) six Red Valve design drawings reflecting modifications made by Defendants in February or March 2018;

d. information related to in-house and propriety manufacturing processes that are not in the public domain, including programs involving size bevel gears, calculation of rim pulls, and Checkmate rubber strip calculators;

e. documents revealing that Defendants ordered actuators and animations under the Titan brand from Cowan Dynamics, Red Valve's actuator supplier, and Marthon, a company Red Valve uses to create animations of Red Valve products.

30. In February 2018, Payne instructed Red Valve builders Jessica Messer and Doris Spencer to build a 6" 75 Buna POT (a Red Valve sleeve) without an order number. Red Valve parts are not typically built without an order number. Payne instructed Messer to bypass shipping and deliver the part to Payne when it was completed. Payne removed the part from the Red Valve premises.

31. Between March 7, 2018 and March 10, 2018, Cruzito "Zeke" Valentin of Patch Rubber Co., one of Red Valve's rubber and fabric vendors, and Payne exchanged emails about providing Valentin with a sample of "Orange Neo" (i.e., orange neoprene), a synthetic rubber. Red Valve's standard neoprene is black. In the applicable time period, Red Valve did not receive any inquiries or orders that required the production of orange neoprene.

32. On March 12, 2018, Aedo emailed Alan Black of Upwey Valve & Engineering renderings of a Titan valve called the PLT Platinum pinch valve. Aedo stated that the "[l]iterature and operation animation and [installation & operation manual] are

under revision in marketing, so we should have it within 5-7 days." (Pls.' Exs. Supp. Mot. Prelim. Inj. Ex. P.)

33. Defendants had planned to attend a mining show in Santiago, Chile, scheduled for April 23–27, 2018, to market Titan and use the event as Titan's official launch. Defendants intended to have two valves by that time for display, one manual and one with a pneumatic actuator. On January 24, 2018, Fabian stated he would send an "email blast to customer data base [sic] I am obtaining now" regarding the Santiago event. (Pls.' Exs. Supp. Mot. Prelim. Inj. Ex. Q.)

34. In their Verified Complaint, P.I. Motion, and supporting briefs and affidavits, Plaintiffs contend that trade secret protection under N.C. Gen. Stat. § 66-152, *et seq*., is specifically warranted for the following Red Valve information:

(1) the prices Red Valve charges for its products and the formula it uses to price products ("Price Data");

(2) information about Red Valve's current and prospective customers, customer purchasing preferences, payment amount, ordering history, and common customer requests and/or complaints ("Customer Database");

(3) documents that aid Red Valve in manufacturing products, including engineering drawings, build sheets, and design drawings for creating castings and polymer products ("Design Documents");

(4) confidential and proprietary formulas, programs, devices, compilations of information, methods, techniques, and processes Red Valve uses to design and manufacture superior flow control products as outlined in meticulous detail in the affidavit of Mike Duer . . . [("Manufacturing Processes")]; and

(5) information Red Valve maintains about the suppliers it purchases component parts from, which are used to manufacture its products, and the prices charged by each vendor ("Vendor Lists"; collectively "Red Valve's Alleged Trade Secrets," all of which are included in Red Valve's "confidential and proprietary information").

(Pls.' Mem. Law Supp. Mot. Prelim. Inj. 4, ECF No. 27.)

35. Red Valve's Price Data consists of material, labor, and other costs used to create its products which is then imported into formulas used to price its products. Red Valve has developed and refined its Price Data over many years. Because many of the products Red Valve makes are specialized, utilization of its Price Data to quote a competitive price to a customer is critical to Red Valve's business.

36. Red Valve's Price Data is stored in a database maintained by Red Valve and summarized in a Price Book. The Price Book is regularly and frequently used by Red Valve in its sales activities. Red Valve Price Data, including a Red Valve Price Book, was found in the Dropbox account maintained by Defendant Aedo on March 14, 2018. Red Valve sells its finished products directly to customers or through sales representatives, who are required to sign confidentiality and non-disclosure agreements and must agree not to distribute Red Valve's Price Book.

37. Red Valve's Customer Database contains information collected over many years concerning customers' names, contact information, purchasing preferences, prices paid for orders, order history, and requests and complaints about Red Valve products. Information concerning Red Valve's customers was found in a Dropbox account maintained by Defendant Aedo on March 14, 2018. Red Valve requires its customers to agree not to disclose the price or terms of a transaction with Red Valve. Red Valve's sales representatives also must agree not to distribute to third parties Red Valve's customer lists, customer preferences, or other customer-specific information without Red Valve's consent.

38. Red Valve's Design Documents have been created so that Red Valve can readily create and reproduce products it has developed over the span of many years. The Design Documents include material specifications and quantities, descriptive notes, and drafting dimensions, and notations such as length, angle, diameter, tolerance, weld details, and surface finish specifications. Of particular relevance here, Red Valve's Design Documents include the technical and proprietary designs of the rubber sleeves that Red Valve manufactures.

39. Red Valve's Design Documents also include build sheets, which are documents containing a comprehensive listing of the quantity and dimensions of each elastomeric and fabric material used in the hand-fabrication of rubber sleeves and the detailed sequence in which each material is placed on the mandrel and intermediate layers until the final elastomer/fabric matrix is complete. Numerous drawings, including CAD drawings involving the design of rubber sleeves, were found in the Titan folder of Aedo's Dropbox account, and many build sheets were found in external devices and personal folders used by Payne. Red Valve labels its proprietary Design Documents with restrictive confidentiality language prohibiting disclosure by those to whom it provides its Design Documents.

40. Red Valve's Manufacturing Processes include many of the critical processes and procedures that are involved in transforming raw materials into finished Red Valve products. Not all of Red Valve's Manufacturing Processes are written down, but they are learned through experience in manufacturing and testing products at Red Valve. The Manufacturing Processes result from the extensive research and

development conducted by Red Valve for the purpose of saving time, money, and resources in the design and manufacture of Red Valve's products.

41. The Manufacturing Processes include formulas, programs, devices, compilations of information, techniques, and processes that Red Valve uses to create the end product based on a customer's requirements. Although Red Valve has offered lengthy descriptions of its Manufacturing Processes from its chief engineer, Mike Duer, the Company has identified only the following Manufacturing Processes as proprietary and unique to Red Valve: (i) "programs to size bevel gears and calculate rim pull, and a Checkmate rubber strip calculator[;]" (ii) "the temperature and time required for the various sizes and geometrics of uncured fabric-reinforced elastometric parts to spend in the vulcanizer/autoclave that results in all layers being chemically fused together thereby producing a product that can withstand a wide range of pressure and thrust forces and provide a long life without premature failure[;]" and (iii) "[f]or knife gates, proprietary manufacturing process technology and controls [that] are needed to consistently produce a seat that provides a reliable seal, that doesn't leak, and assures the valve will close with the minimum thrust." (Pls.' Exs. Supp. Mot. Prelim. Inj. Ex. B [hereinafter "Duer Aff."] ¶¶ 37–39.) A number of documents pertaining to these "in-house and proprietary programs that are not in the public domain" were found in the Aedo Dropbox account. (Duer Aff. ¶ 37.)

42. The Manufacturing Processes Red Valve uses cannot be determined by examining finished products. In particular, the Manufacturing Processes used to

make a Red Valve valve, including the specifications utilized in making the rubber sleeve, cannot be discerned or replicated by reverse engineering.

43. Red Valve's Vendor Lists consist of information Red Valve maintains about the suppliers from which it purchases component parts, including the most favorable prices it has been able to negotiate with each vendor for the products Red Valve uses in its business. Because these prices have been developed through many years of relationship building with these vendors, Red Valve does not share this information to persons outside Red Valve.

44. Red Valve has made a substantial investment of time and money to research and develop the confidential and proprietary information it uses in the design, manufacture, marketing, and sale of its products. Through its investment, Red Valve has gained a competitive advantage, which would be lost or substantially impaired should its competitors have access to or use Red Valve's confidential and proprietary information.

45. Red Valve requires all of its employees to agree to policies preventing disclosure or misuse of Red Valve's confidential and proprietary information. Red Valve employees must certify that they have read the Red Valve Employee handbook and agree to "follow the policies," including the Company's "non-disclosure" policy, which forbids the improper use or disclosure of Red Valve's confidential and proprietary information. Red Valve requires annual ethics training for all of its employees to learn about the unauthorized use and disclosure of Red Valve's confidential and proprietary information. At the end of the training, employees must

certify that they have read and understand Red Valve's ethics code, including the provisions concerning the prohibition on disclosure of Red Valve's confidential and proprietary information.

46. Red Valve implements a "Separation of Duties" policy and role-based security, which restricts access to Red Valve's confidential and proprietary information to employees who need access to the specific information to complete their individual job duties. Red Valve keeps databases that track the level of access of each employee and the information the employee may access in the performance of his job duties. Red Valve makes each access determination on an individual basis.

47. To help protect its Design Documents and Manufacturing Processes, Red Valve prohibits entry at its manufacturing plant to any person without a secured access card. To protect its Customer Database and Price Data from disclosure to outsiders, Red Valve sells its finished products directly to customers or through sales representatives, who are required to sign confidentiality and non-disclosure agreements. The sales representatives must agree that they will not distribute Red Valve's customer or pricing information.

48. Red Valve has implemented a number of other measures to protect its confidential and proprietary information, including upgrading its business process management software, EPICOR, physically relocating the EPICOR system to a more secure location, and inactivating and deleting user IDs for employees that no longer work at Red Valve. Departing employees are also required to return any and all confidential and proprietary information of Red Valve in the employee's possession

at the end of their employment. This includes removing any Red Valve confidential and proprietary information on the employee's cell phone or laptop.

III.

CONCLUSIONS OF LAW

49. Based upon the foregoing findings of fact, the Court makes the following conclusions of law:

50. The Court has jurisdiction over the parties and subject matter of this action.

51. Pursuant to N.C. Gen. Stat. § 7A-45.4, this case has been properly designated as a complex business case.

52. The purpose of an injunction "is ordinarily to preserve the *status quo* . . . [and i]ts issuance is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (quoting *State v. School*, 299 N.C. 351, 357–58, 261 S.E.2d 908, 913 (1980)). A plaintiff seeking an injunction must show (i) likelihood of success on the merits and (ii) that the plaintiff is likely to sustain irreparable loss absent an injunction, or that an injunction is necessary to protect the plaintiff's rights during the litigation. *Id.* at 401, 302 S.E.2d at 759–60; *see also* N.C. R. Civ. P. 65; N.C. Gen. Stat. § 1-485.

53. The North Carolina Trade Secrets Protection Act ("TSPA") expressly authorizes a court to preliminarily enjoin "actual or threatened misappropriation of a trade secret." N.C. Gen. Stat. § 66-154(a). Under North Carolina law, "[i]t is well settled that an injunction will issue to prevent unauthorized disclosure and use of

trade secrets and confidential information." *Barr-Mullin, Inc. v. Browning*, 108 N.C. App. 590, 594, 424 S.E.2d 226, 229 (1993). The burden is on Plaintiffs to establish their right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975).

54. Our Supreme Court has defined "irreparable injury" as not necessarily "beyond the possibility of repair or possible compensation in damages, but that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949). If irreparable injury is not shown, the preliminary injunction will be denied. *United Tel. Co. of Carolinas, Inc. v. Universal Plastics, Inc.*, 287 N.C. 232, 236, 214 S.E.2d 49, 52 (1975); *see Coble Dairy Products Coop., Inc. v. State ex rel. N.C. Milk Comm'n*, 58 N.C. App. 213, 214, 292 S.E.2d 750, 751 (1982).

55. Moreover, "[a] court of equity must weigh all relevant facts before resorting to the extraordinary remedy of an injunction." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 694, 228 S.E.2d 478, 484 (1976). The burden is on the moving party to establish its right to a preliminary injunction, but the remedy "should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at *17 (N.C. Super. Ct. Sept. 29, 2011); *see Travenol Labs.*, 30 N.C. App. at 692, 228 S.E.2d at 483. A trial court generally "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted." *Kaplan v. Prolife Action League of Greensboro*, 111

N.C. App. 1, 16, 431 S.E.2d 828, 835 (1993), *overruled on other grounds by Sharpe v. Worland*, 351 N.C. 159, 166, 522 S.E.2d 577, 581 (1999).

56.     Under the TSPA, "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation[.]"  N.C. Gen. Stat. § 66-154(a).   Actual or threatened misappropriation may be established by the introduction of "substantial evidence" that a person against whom relief is sought "[k]nows or should have known of the trade secret; and [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner [of the trade secret]."  N.C. Gen. Stat. § 66-155.   A defendant may rebut an owner's claim of misappropriation by proving that the defendant acquired the owner's trade secret information through independent development or reverse engineering, or by proving that the owner's "trade secret" information was received from another person with a right to disclose the information or is generally known in the industry.  N.C. Gen. Stat. §§ 66-155, 66-152.

57.     A trade secret is defined under the NCTSPA as:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that
>
>> a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).  A plaintiff, therefore, must demonstrate that the alleged trade secret information is of actual or commercial value, is not generally known or readily ascertainable, and is subject to reasonable efforts to maintain its secrecy. *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *25–26 (N.C. Super. Ct. Apr. 23, 2015).

58.    In determining whether the processes or information are trade secrets, North Carolina courts generally consider six factors:

> (1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News v. New Hanover Regional Medical Ctr.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).  These factors overlap, and courts considering these factors do not always examine them separately and individually.  *SCR-Tech LLC v. Evonik Energy Servs. LLC,* 2011 NCBC LEXIS 27, at *34 (N.C. Super. Ct. July 22, 2011).  Further, a successful trade secrets claim requires "a plaintiff [to] identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, No. 252A16, 2018 N.C. LEXIS 222, at *10–11 (N.C.  Apr. 6, 2018) (quoting *VisionAir, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004)).

59.     Red Valve's Price Data, Customer Database, and Vendor Lists each consist of information that generally has been recognized to constitute trade secrets under North Carolina law.  *See, e.g., Id.* at *12 (recognizing that "information regarding customer lists, pricing formulas and bidding formulas can qualify as a trade secret"); *Ge Betz, Inc. v. Conrad*, 231 N.C. App. 214, 234, 752 S.E.2d 634, 649 (2013) (holding "pricing information, customer proposals, historical costs, and sales data" may constitute trade secrets); *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 174, 423 S.E.2d 324, 327 (1992) (holding customer lists and pricing and bidding formulas may constitute trade secrets under TSPA); *Koch Measurement Devices, Inc. v. Armke*, 2013 NCBC LEXIS 45, at *8 (N.C. Super. Ct. Oct. 14, 2013) (holding "customer lists, including names, contact persons, addresses and phone number[s] . . . [customer] ordering habits, history . . . [and company] pricing and inventory management strategies" may constitute trade secrets).  In particular, "where an individual maintains a compilation of detailed records over a significant period of time," such that they have particular value as a compilation or manipulation of information, "those records could constitute a trade secret even if 'similar information may have been ascertainable by anyone in the . . . business.'"  *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *13–14 (N.C. Super. Ct. May 1, 2015) (quoting *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376, 542 S.E.2d 689, 692 (2001)); *see also RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *32 (N.C. Super. Ct. Feb. 18, 2016).

60.    The evidence of record shows that the Customer Database, Price Data, and Vendor Lists contain more than basic information readily ascertainable from public sources, *see, e.g., Bldg. Ctr., Inc. v. Carter Lumber of the North, Inc.*, 2017 NCBC LEXIS 85, at *20 (N.C. Super. Ct. Sept. 21, 2017) (North Carolina law "does not consider a customer list containing only information that is easily accessible through a telephone book or other readily available sources to be a trade secret"); *Koch*, 2015 NCBC LEXIS 45, at *13 ("information collected in the routine course of business, without any efforts to compile, develop, or maintain the information, d[oes] not constitute a trade secret"), and instead are compilations of confidential information that have great competitive value to Plaintiffs.

61.    The Customer Database contains a compilation of purchasing preferences and order histories as well as customer requests and complaints that Red Valve has received over many years.  *See, e.g., Fastening Sys. v. Grabber Const. Prods., Inc.*, 2015 NCBC LEXIS 42, at *11 (N.C. Super. Ct. Apr. 25, 2015) ("confidential customer information and customer buying preferences and history" may constitute trade secrets).  This information has actual or commercial value and is not generally known or readily ascertainable.  Red Valve has engaged in reasonable efforts to maintain the secrecy of this information and uses its Customer Database to gain a competitive advantage in marketing to existing customers and prospective customers.  Plaintiffs have described this information with particularity, and the evidence of record shows that Defendants have acquired and possessed this information either in preparation for or after launching Titan.  (*See* Ritzi Aff. Exs. A–C.)

62. Red Valve's Price Data contains both a compilation of information that includes Red Valve's pricing history for each of its products and Red Valve's formula for preparing price quotes, which is summarized in Red Valve's Price Book. The disclosure of such information would be very advantageous to Red Valve's competitors and harmful to Red Valve's competitive position. North Carolina courts have long recognized that this sort of information constitutes a protectable trade secret under the TSPA. *See, e.g., Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 174 N.C. App. 49, 53, 620 S.E.2d 222, 226 (2005) (holding trade secrets may include "cost history information; price lists; and confidential customer lists, pricing formulas and bidding formulas"); *Byrd's Lawn & Landscaping*, 142 N.C. App. at 375, 542 S.E.2d at 692 ("Confidential data regarding operating and pricing policies can also qualify as trade secrets. It is apparent that the ability to predict a competitor's bid with reasonable accuracy would give a distinct advantage to the possessor of that information[.]"); *see also Krawiec*, 2018 NCBC LEXIS 222, at *12 (to similar effect). This information has actual or commercial value and is not generally known or readily ascertainable. Plaintiffs have engaged in reasonable efforts to maintain the secrecy of this information, and the evidence shows that Payne or Aedo acquired and/or possessed numerous documents containing Red Valve's Price Data, including Red Valve's Price Book, at or about the time they formed Titan. (*See* Ritzi Aff. Exs. D–G.)

63. Red Valve's Vendor Lists contain a compilation of information over the span of many years regarding the suppliers from which it has purchased component parts.

The identification and compilation of this information, including the specification of the favorable pricing that Red Valve has negotiated with its vendors, provides Red Valve a significant advantage over its competitors. This information has actual or commercial value and is not generally known or readily ascertainable. Plaintiffs have engaged in reasonable efforts to maintain the secrecy of this information. The North Carolina courts have concluded that such information constitutes a trade secret under Chapter 66. *See, e.g., Koch Measurement Devices, Inc.*, 2015 NCBC LEXIS 45, at *13 ("[W]here an individual maintains a compilation of detailed records over a significant period of time, those records could constitute a trade secret even if 'similar information may have been ascertainable by anyone in the . . . business.'" (quoting *Byrd's Lawn & Landscaping*, 142 N.C. App. at 376, 542 S.E.2d at 692)).

64. Red Valve's Design Documents consist of engineering and design drawings that are typically recognized as trade secrets under North Carolina law. *See, e.g., DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at *16–18 (N.C. Super. Ct. May 12, 2015) (product designs may constitute trade secrets). This information has actual or commercial value and is not generally known or readily ascertainable. Plaintiffs have engaged in reasonable efforts to maintain the secrecy of this information. Red Valve has identified the Design Documents with specificity and the evidence of record shows that Defendants have acquired and used certain Design Documents without Red Valve's consent in furtherance of Titan's business. (*See* Duer Aff. Exs. A–K.)[2]

---

[2] Defendants argue that the evidence Red Valve offers to support its contention that Defendants have misappropriated its sleeve Design Documents is readily found on Red

65.     Red Valve's Manufacturing Processes consist of information typically found by North Carolina courts to constitute trade secrets. *See Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 568, 754 S.E.2d 852, 859 (2014) (holding that manufacturing processes may constitute trade secrets and entering preliminary injunction based on identification of trade secrets as "various raw materials and raw material treatments; extraction, filtration, separation, and distillation techniques; and methods for compounding of flavors, packaging, and plant utility . . . used in the production of flavor materials derived from seven specifically identified substances, such as cocoa, ginseng, and chamomile"); *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 594, 767 S.E.2d 870, 877 (2014) (recognizing that specific steps and refinements in a process may constitute trade secrets); *see also, e.g.*, *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ("particularized plans or processes developed by [the plaintiff] and disclosed to [the defendant] . . . which are unknown to others in the industry and which give the [defendant] an advantage over [its] competitors" were trade secrets under Illinois' similar trade secrets protection statute).

66.     Such processes, however, must be unique to Plaintiffs or modified by Plaintiffs in unique ways to qualify for trade secret protection under the TSPA. *See, e.g.*, *Unimin Corp. v. Gallo*, 2014 NCBC LEXIS 44, at *23 (N.C. Super. Ct. Sept. 4, 2014) (dismissing trade secrets claim where plaintiff failed to allege manufacturing processes were unique or had been modified by plaintiff in unique ways); *see also,*

Valve's website (https://www.redvalve.com/products/pinch-valve-sleeves).  The information on the website, however, does not contain the technical detail contained in Red Valve's Design Documents.

*e.g., FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1481 (W.D.N.C. 1995) (denying preliminary injunction for violation of TSPA where plaintiff failed to "come forward with evidence establishing the precise nature of its trade secrets"); *Patch Rubber Co. v. Toelke*, No. 5:13-CV-379-BO, 2013 U.S. Dist. LEXIS 84104, at *13 (E.D.N.C. June 14, 2013) (denying preliminary injunction where plaintiff failed to demonstrate "what, if anything, in its strategic plan, formula or customer cost information is deserving of trade secret protection").

67. Applying these standards here, the Manufacturing Processes described in paragraph 41 above are the only Manufacturing Processes Red Valve has identified as unique to Red Valve and that otherwise qualify for protection as trade secrets under the TSPA ("Protectable Manufacturing Processes" or the "Processes"). This information has actual or commercial value and is not generally known or readily ascertainable. Plaintiffs have engaged in reasonable efforts to maintain the secrecy of this information. The evidence of record shows that Defendants knew, or should have known, of Red Valve's Protectable Manufacturing Processes from their long involvement with Red Valve's manufacturing operations and have had a specific opportunity to acquire these Processes for disclosure or use, or have acquired, disclosed, or used these Processes, without the express or implied consent of Plaintiffs as the owner of the Processes. *See* N.C. Gen. Stat § 66-155; *Horner*, 232 N.C. App. at 568–69, 754 S.E.2d at 859–61 (finding plaintiff's trade secret identification sufficient for defendant to "delineate that which he was accused of misappropriating" in light

of defendant's knowledge of alleged trade secret (citing *VisionAIR, Inc.,* 167 N.C. App. at 510–11, 606 S.E.2d at 364).

68. In particular, the evidence shows, *inter alia*, that Aedo and Payne—while still employed at Red Valve—downloaded copies of Red Valve's confidential and proprietary information to personal folders and external devices at the same time they started collaborating with Farris to create Titan. Aedo labeled one of the folders he created to house this information "Titan." With Farris, Aedo and Payne actively worked to launch Titan during their employment with Red Valve, and during that time, they also actively acquired and stored information relating to and constituting Red Valve's Customer Database, Price Data, Design Documents, and Protectable Manufacturing Processes.

69. The Court concludes that the evidence of record shows that Defendants have engaged in the actual and threatened misappropriation of Plaintiffs' Customer Database, Price Data, Design Documents, and Protectable Manufacturing Processes in violation of the TSPA. *See, e.g.*, *TSG Finishing*, 238 N.C. App. at 595, 767 S.E.2d at 878 (holding that continued access to trade secrets at a time when Defendants were planning to leave the company and then compete against it "is precisely the type of threatened misappropriation, if not actual misappropriation, that the TSPA aims to prevent through issuance of a preliminary injunction"); *Horner*, 232 N.C. App. at 570, 754 S.E.2d at 860 (finding a "threat of misappropriation" where defendant commenced work for a competitor immediately after resigning and shortly after sending trade secret information to defendant's personal email account); *Byrd's Lawn*

*& Landscaping,* 142 N.C. App. at 377, 542 S.E.2d at 693 (evidence of misappropriation where defendant immediately started his own business in competition with former employer after resigning and underbid former employer on eleven of fourteen projects); *Barr-Mullin,* 108 N.C. App. at 596–97, 424 S.E.2d at 230–31 (finding misappropriation supporting a preliminary injunction where defendant helped develop software while working for plaintiff and began producing identical software after leaving plaintiff's employment).

70. The Court further concludes, however, that Plaintiffs have failed to offer evidence demonstrating Defendants' actual or threatened misappropriation of Red Valve's Vendor Lists at this stage of the litigation. The only evidence Plaintiffs offer in support of Defendants' alleged misappropriation of the Vendor Lists is Titan's order of parts from two vendors that Red Valve uses—Cowan Dynamics and Marathon. Significantly, Plaintiffs have not pointed to any evidence showing Defendants' use or threatened use of information found in Red Valve's Vendor Lists. The most the evidence of record shows is that Titan potentially chose to use these two vendors because of Aedo's and Payne's prior work at Red Valve, but the services these two vendors provide is public knowledge and readily ascertainable. *See Koch*, 2015 NCBC LEXIS 45, at *13 ("information will not constitute a trade secret if that information could be easily compiled by someone in the industry through public listings, such as trade show and attendance lists, or through a telephone directory." (internal citations omitted)). Thus, the Court concludes that Plaintiffs have failed to show a likelihood of success on their claim for misappropriation of Red Valve's Vendor

Lists at this time. *See, e.g., Unimin Corp.*, 2014 NCBC LEXIS 44, at \*39 ("Plaintiff has not brought forward evidence of specific actions which indicate that Defendants intend to disclose or use Plaintiff's alleged trade secret information sufficient to justify the entry of preliminary injunctive relief based on a threat of misappropriation.").

71. Based on the evidence of record, the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits of their claim for misappropriation of trade secrets based on Defendants' actual and threatened misappropriation of Plaintiffs' Customer Database, Price Data, Design Documents, and Protectable Manufacturing Processes (the "Trade Secrets").

72. The Court next turns to Plaintiffs' breach of contract claim against Aedo. Indiana law governs the Trade Secret Agreement. Under Indiana law, the essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Rogier v. Am. Testing and Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000). In contrast to North Carolina law, Indiana law provides that continued employment constitutes due and adequate consideration in exchange for agreeing to the terms of a restrictive covenant. *See Rollins v. Am. State Bank*, 487 N.E.2d 842, 843 (Ind. Ct. App. 1986) (citing *Leatherman v. Mgmt. Advisors, Inc.*, 448 N.E.2d 1048, 1050 (Ind. 1983)); *see also Licocci v. Cardinal Assocs., Inc.*, 445 N.E.2d 556, 565 (Ind. 1983). Based on the evidence of record, the Court concludes that Plaintiffs have shown a likelihood of success on their claim that the Trade Secret Agreement is an enforceable contract that restricts Aedo from disclosing or using Red

Valve's confidential and proprietary information, including Red Valve's Trade Secrets, and that Aedo has breached that Agreement.

73. North Carolina courts have long recognized that preliminary injunctive relief is especially appropriate where a company's trade secrets are at stake:

> [M]isappropriation of a trade secret is an injury of such continuous and frequent recurrence that no reasonable redress can be had in a court of law. The very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects. The party wronged may forever lose its competitive business advantage or, at the least, a significant portion of its market share.

*Barr-Mullin*, 108 N.C. App. at 597, 424 S.E.2d at 230 (internal quotation marks omitted). Accordingly, "in most instances, courts presume irreparable harm where a trade secret has been misappropriated." *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996). A preliminary injunction is especially warranted where misappropriation threatens to deprive a business of its competitive advantage. *Barr-Mullin*, 108 N.C. App. at 597, 424 S.E.2d at 230; *see also TSG Finishing*, 238 N.C. App. at 602, 767 S.E.2d at 882 (irreparable injury shown where the plaintiff was at risk of losing "whatever competitive advantage it may have had" in its industry).

74. To prove irreparable injury,

> it is not essential that it be shown that the injury is beyond the possibility of repair or possible compensation in damages, but that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law.

*Barr-Mullin*, 108 N.C. App. at 597, 424 S.E.2d at 230 (quoting *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949)). Additionally, the Supreme Court of North

Carolina has "consistently adhered to the proposition that where the principal relief sought is a permanent injunction, it is particularly necessary that the preliminary injunction issue." *A.E.P. Indus.*, 308 N.C. at 408, 302 S.E.2d at 763.

75. Plaintiffs have suffered, or will suffer, financial harm as a consequence of Defendants' use and disclosure of Plaintiffs' Trade Secrets. However, the damages Plaintiffs have suffered, or will suffer, are difficult to ascertain with certainty.

76. Nevertheless, it is clear that Defendants' actual and threatened misappropriation of Plaintiffs' Trade Secrets, if not enjoined, will damage Plaintiffs' business, adversely impact Red Valve's market position, and dull its competitive advantage. That injury is "not one to which [Red Valve] should be required to submit[.]" *Barr-Mullin*, 108 N.C. App. at 597, 424 S.E.2d at 230. Its recurrence is "continuous and frequent" as Defendants intend to actively compete against Red Valve in certain of the markets in which Red Valve currently competes. Additionally, Red Valve seeks a permanent injunction in this case, which also weighs in favor of its request for a preliminary injunction to preserve its market share and competitive advantage. *A.E.P. Indus.*, 308 N.C. at 408, 302 S.E.2d at 763.

77. The issuance of a preliminary injunction "is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *Id.* at 400, 302 S.E.2d at 759 (quoting *State v. School*, 299 N.C. at 357, 261 S.E.2d at 913). The Court, in exercising its discretion, "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted." *Williams v. Greene*, 36 N.C.

App. 80, 86, 243 S.E.2d 156, 160 (1978). "In effect, the harm alleged by the plaintiff must satisfy a standard of relative substantiality as well as irreparability." *Id.*

78. Defendants' actions have resulted in irreparable harm to Plaintiffs, and if not enjoined, will continue to result in irreparable harm to Plaintiffs because there is no adequate remedy at law, there is substantial difficulty and uncertainty in determining the amount of damages to be awarded for Defendants' conduct, and the injury Defendants have inflicted, and unless enjoined will continue to inflict, on Plaintiffs is one to which Plaintiffs should not be required to submit or Defendants permitted to inflict based on the record before the Court.

79. The Court has engaged in a balancing process, weighing the potential harm to Plaintiffs if an injunction is not issued against the potential harm to Defendants if injunctive relief is granted, and finds that the potential harm to Plaintiffs if the preliminary injunction is not issued substantially outweighs the potential harm to Defendants in the event the Court grants Plaintiffs' requested injunctive relief.

80. The Court further concludes, in the exercise of its discretion, that the issuance of a preliminary injunction is necessary for the protection of Plaintiff's rights during the course of this litigation. Accordingly, the Court concludes, in the exercise of its discretion, that Plaintiff is entitled to a preliminary injunction restraining and enjoining Defendants and all other persons in active concert or participation with any Defendant from using or disclosing Plaintiffs' Trade Secrets.

81. The Court has previously ordered Defendants to "return to Red Valve any and all Red Valve property in their possession, including any property containing Red

Valve's Trade Secrets [as defined in the TRO] or any other confidential and proprietary information of Red Valve" (the "Return Order"). (TRO ¶ 3 at p. 6, ECF No. 7.) The Court's Return Order is not restricted by Plaintiffs' identification of their trade secrets under the TSPA; rather, the Court's Return Order requires Defendants to return Plaintiffs' property as a matter of contract and common law because it is undisputed that Defendants have had Plaintiffs' property in their possession and acknowledge that they have no legal right to possess and retain Plaintiffs' property.

82. Further, the Court's Return Order intended that Defendants, who have no right to retain Plaintiffs' property, will not retain copies or originals of any Red Valve property that they are required to return. Accordingly, Defendants are hereby ordered to return within seven business days all Red Valve property in their possession, including any copies thereof, and certify to the Court that they have returned all such property to Red Valve and do not retain any Red Valve property in their possession. Defendants' failure to comply with this provision will be grounds for the issuance of an order to show cause why Defendants should not be held in civil or criminal contempt for such failure.

83. "[T]he trial court has power not only to set the amount of security but to dispense with any security requirement whatsoever where the restraint will do the defendant no material damage, and where the applicant for equitable relief has considerable assets and is able to respond in damages if [the] defendant does suffer damages by reason of a wrongful injunction." *Stevens v. Henry,* 121 N.C. App. 150, 154, 464 S.E.2d 704, 707 (1995) (quoting *Keith v. Day*, 60 N.C. App. 559, 562, 299

S.E.2d 296, 298) (1983) (alterations and quotations omitted); *see also Bolier & Co., LLC v. Decca Furniture (USA), Inc.*, 2015 NCBC LEXIS 55, at *32 (N.C. Super. Ct. May 26, 2015).

84. Neither Plaintiffs nor Defendants have challenged or otherwise objected to the amount of security the Court required as a condition of the TRO (i.e., $500). The Court further concludes, based on publicly available information, that Plaintiffs have considerable assets such that they will be able to respond in damages if Defendants were to suffer by a wrongful injunction. The Court therefore concludes, in the exercise of its discretion, that the security of $500 previously posted by Plaintiffs is reasonable and appropriate in the circumstances as a condition of granting this preliminary injunction.

IV.

CONCLUSION

85. **WHEREFORE**, based upon the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it is hereby **ORDERED**, in the exercise of the Court's discretion, that pending final resolution of this civil action, and unless and until otherwise ordered by this Court:

a. Defendants, and any persons or entities in active concert or participation with any of them, are hereby **RESTRAINED** and **ENJOINED**, during the pendency of this action, from using, disclosing, or distributing Plaintiffs' Customer Database, Price Data,

Design Documents, and Protectable Manufacturing Processes (as defined herein).

b. Within seven business days of the entry of this Order, each Defendant shall (i) return to Plaintiffs all of Plaintiffs' property, including but not limited to Plaintiffs' Trade Secrets, and (ii) certify under oath in a written statement filed with the Court that Defendant has returned to Plaintiffs all of Plaintiffs' property in Defendant's possession and further that Defendant does not retain or possess any Red Valve property.

c. The Court has considered, but will not require, the posting of additional security in connection with the issuance of this Order. The Court concludes, in the exercise of its discretion, that the $500 security previously posted is reasonable and appropriate as a condition of granting this preliminary injunction. The Court's order concerning Plaintiffs' posting of security is without prejudice to any party's right to move the Court to adjust the amount of the security for good cause shown.

**SO ORDERED**, this 17th day of April, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases